Slip Op. 15 - 105

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| DIAMOND SAWBLADES MANUFACTURERS' COALITION, | |
| Plaintiff, | |
| v. | Before: R. Kenton Musgrave, Senior Judge |
| UNITED STATES, | Court No. 13-00078 |
| Defendant, | |
| and | |
| BEIJING GANG YAN DIAMOND PRODUCTS COMPANY, GANG YAN DIAMOND PRODUCTS, INC., and CLIFF INTERNATIONAL, LTD., | |
| Intervenor-defendants. | |

**OPINION**

[Sustaining results of redetermination of first administrative review antidumping duty order on diamond sawblades and parts thereof from the People's Republic of China.]

Decided: September 23, 2015

*Daniel B. Pickard* and *Maureen E. Thorson*, Wiley Rein LLP, of Washington, DC, for the plaintiff.

*Alexander V. Sverdlov*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for the defendant. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White*, *Jr.*, Assistant Director. Of Counsel on the brief was *Aman Kakar*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

*Jeffrey S. Neeley* and *Michael S. Holton*, Husch Blackwell LLP, of Washington, DC, for the defendant-intervenors.

Musgrave, Senior Judge: *Diamond Sawblades and Parts Thereof from the People's Republic of China* ("PRC"), 78 Fed. Reg. 11143 (Feb. 15, 2013), and accompanying issues and decision memorandum (Feb. 8, 2013) ("*IDM*"), PDoc 353, which concerns the first administrative review of subject merchandise covering the 2009-2010 period, was previously remanded for further proceedings consistent with Slip Op. 14-50 (Apr. 29, 2014), familiarity with which is here presumed. Before the court are the final results of remand ("*Redetermination*" or "*RR*") and the parties' comments thereon. As a result of remand, the contentions in this case now center on Commerce's reduction of the "PRC-wide" rate of antidumping duty from 194.09% to 82.12%, which appears to be an issue of first impression. For the following reasons, the court sustains the *Redetermination*.

*Background*

The matter was voluntary remanded in part, at the request of the defendant International Trade Administration, U.S. Department of Commerce ("Commerce"), in order to reconsider the determination to grant a separate rate to the "ATM entity," a "collapsed" respondent in the underlying administrative review.[1] Also remanded was whether collapse of the ATM entity

---

[1] *See* 19 C.F.R. §351.401(f). For purposes of the administrative review, the "ATM entity" was found to consist of the three companies found to be affiliated in the underlying investigation (Advanced Technology & Materials Co., Ltd., Beijing Gang Yan Diamond Products Co., and Yichang HXF Circular Saw Industrial Co., Ltd.) combined with additional affiliates AT&M International Trading Co., Ltd., and Cliff International Ltd. RR at 1 n.1, referencing Memorandum *re Diamond Sawblades and Parts Thereof from the PRC: Determination to Include Additional Companies in the ATM Single Entity* (Nov. 30, 2011), CDoc 103, PDoc 118; *see also IDM* at 2. The intervenor-defendants who participated in briefing, Beijing Gang Yan Diamond Products Co. and Gang Yan Diamond Products, Inc., are herein referenced "ATM" for the sake of consistency; Cliff International Ltd. did not participate in briefing.

should have included the China Iron and Steel Research Institute ("CISRI"). Consistent with the redetermination addressed by *Advanced Technology & Materials Co. v. United States*, Court No. 09-00511 ("*Advanced Tech*"), *remand results sustained*, 37 CIT ___, 938 F. Supp. 2d 1342 (2013), *aff'd*, 581 Fed. Appx. 900 (Fed. Cir. 2014), on remand Commerce redetermined that the ATM entity failed to rebut the presumption of state control and demonstrate entitlement to a separate rate. Having thus been redetermined part of the PRC-wide entity, the ATM entity is subject to the PRC-wide antidumping duty rate. That determination is hereby sustained.

      Due to finding that the ATM entity is not entitled to a separate rate, Commerce considered the issue of whether CISRI should be included in the ATM entity as moot. *See* RR at 2. The plaintiff, Diamond Sawblades Manufacturers' Coalition ("DSMC") contests that conclusion due to the following.[2] During the less-than-fair-value ("LTFV") investigation, Commerce determined the PRC-wide rate to be 164.09% based on non-cooperation from the entities comprising the PRC-wide entity. On remand of the instant matter, however, Commerce determined that the PRC-wide rate needed to take into account inclusion of the ATM entity in the PRC-entity. Information on the record had previously enabled determination of the ATM entity's rate as 0.15%. Commerce found, however, that it did not have the necessary sales and production information to calculate that portion of the margin that represents the remaining but unspecified portion of the PRC-wide entity, but it also determined that no part of the PRC-wide entity had failed to cooperate to the best of its ability.

---

[2] According to the DSMC, the agency's draft results did not reflect any downward adjustment of the PRC-wide rate, or any intent to make such an adjustment. DSMC Cmts. at 6 n.4, referencing *Draft Results of Redetermination Pursuant to Court Remand* (Jan. 12, 2015), RRPDoc 2. Instead, DSMC contends, the draft results indicated that the ATM entity would be subject to the 164.09 percent rate. *Id.* referencing RRPDoc at 5.

For its *Redetermination*, therefore, Commerce determined to use a simple average of the previously-assigned PRC-wide rate and the calculated margin for the ATM entity. Commerce thus revised the PRC-wide rate to 82.12% to account for the ATM entity's inclusion in among the PRC-wide entity.

The *Redetermination* satisfies neither party.

*Argument*

ATM argues the results of remand are unlawful because Commerce has found "full cooperation" by the ATM entity and all elements of the PRC-wide entity in this review and because the statute does not allow use of a partial adverse inference if there has been full cooperation. *See*, *e.g.*, Def-Int's Cmts at 1. ATM further argues the adverse portion of the final margin determined for the PRC-wide entity is based on information not on the record of this review nor has that information been corroborated as required by 19 U.S.C. §1677e(c). ATM contends Commerce was and is aware of the precise rate of 0.15% that is applicable to it, a cooperative respondent, and that Commerce must use this rate as the rate that is applicable to it. Def-Int's Cmts. at 6. ATM thus continues to argue that it is somehow entitled to separate consideration notwithstanding. *See*, *e.g.*, *id*. at 11 ("[i]ndeed, a fairly obvious approach here would have been to use the actual factual information on the record of this review and apply the 0.15 percent here as the assessment rate for [ATM], but continue to apply a different and higher rate as the rate for those who failed to respond or cooperate"). Admitting the possibility of a "higher rate" for other members of the PRC-wide entity, ATM does not appear go so far, however, as to argue that the PRC-wide rate should be 0.15%.

The DSMC argue that Commerce's adjustment of the PRC-wide rate is contrary to agency practice and policy, and that the ATM entity should receive the PRC-wide rate that was

calculated during the investigation. Allowing the conduct of a single member of the PRC-wide entity to affect the PRC-wide entity rate, the DSMC argue, "would allow for the PRC-wide entity to potentially manipulate AD results by selectively providing data on the record and dictating what data can be verified." DSMC Resp. to Def-Int's Cmts. at 3, quoting issues and decision memorandum accompanying *Galvanized Steel Wire from the PRC*, 77 Fed. Reg. 17430 (Mar. 26, 2012) (final LTFV determ.) at cmt. 1.C ("*Galvanized Steel Wire*").[3] "In other words, this would allow the PRC-wide entity to manipulate the margin by having a single member of the PRC-wide entity cooperate in an investigation or administrative review and thereby obtain a low margin for the entire PRC-wide entity, defeating the purpose of the Department's separate rates practice." *Id*.

The DSMC also argue the agency's downward adjustment of the PRC-wide rate is premised on the fact that no PRC-wide entity member has failed to cooperate. *Id*. at 9. CISRI is a member of the ATM entity, the DSMC contend; therefore the record "may indeed indicate that the [ATM e]ntity as a whole did not cooperate and . . . , thus, there are uncooperative members of the PRC-wide entity." DSMC Cmts at 8 n.6. Although the DSMC do not elaborate further on that proposition, they also contend Commerce's "Solomonesque" determination is speculative, arbitrary, and capricious, that the record does not support finding, in essence, that the ATM entity accounted for half of exports of subject merchandise to the U.S., and that if the PRC-wide rate is to be adjusted at all, which the DSMC do not concede, then a more logical approach would be based on the number of potential respondents comprising the PRC-wide entity, which the DSMC calculate as 22, *i.e.*, a

---

[3] *See also* issues and decision memorandum accompanying *Carbon and Certain Alloy Steel Wire Rod from the PRC*, 79 Fed. Reg. 53169 (Aug. 29, 2014) (*inter alia* prelim. LTFV determ.) at 18, n.91 (determining not to verify mandatory respondents that had been found to be part of the PRC-wide entity) (citing *Galvanized Steel Wire* at cmt. l.C).

"weighting" of the ATM entity's rate in the PRC-wide rate amounting to 1/22nd. In any case, the DSMC argue, Commerce does not explain whether it is changing its longstanding position or practice regarding non-market economies and the PRC-wide rate and, if so, on what basis:

> For example, is the agency taking the position that application of the PRC-wide rate is necessarily the result of adverse inferences, and thus may not be applied to the extent that the PRC-wide entity is "cooperative"? If so, how does the agency reconcile this view with judicial precedent from the original investigation finding that assignment of the PRC-wide rate is not assignment of an adverse rate? . . . Moreover, how does the agency determine whether the PRC-wide entity as a whole has been cooperative or uncooperative? The agency's remand results do not discuss these questions, or otherwise elucidate the basis, in policy, fact, or past proceedings, for its current actions.

*Id*. at 8.

Addressing the parties' comments, Commerce defends its position as follows:

> Typically, when Commerce determines that an exporter in a non-market economy such as [the PRC] has failed to demonstrate independence from state control, Commerce declines to conduct any further inquiry into the exporter's separate, individual business practices. Instead, Commerce assigns the exporter a single country-wide margin that reflects the aggregate behavior of all the exporters of subject merchandise presumed to be under state control. *See generally* Remand at 7-8; 19 C.F.R. §351.107(d) ("In an antidumping proceeding involving imports from a nonmarket economy country, 'rates' may consist of a single dumping margin applicable to all exporters and producers."); *see also Watanabe Group v. United States*, . . . Slip Op. 10-139 at 8 (Ct. Int'l Trade Dec. 22, 2010) ("Commerce's permissible determination that [a respondent] is part of the PRC-wide entity means that inquiring into [that respondent]'s separate sales behavior ceases to be meaningful."); *Jiangsu Changbao Steel Tube Co., Ltd. v. United States*, 884 F. Supp. 2d 1295, 1312 n.21 (Ct. Int'l Trade 2012) (noting that "losing all entitlement to an individualized inquiry appears to be a necessary consequence of the way in which Commerce applies the presumption of government control").
>
> Here, however, Commerce had already conducted such an individualized inquiry of ATM earlier in its proceedings. Indeed, ATM provided information that enabled Commerce to calculate a specific rate for ATM, based on its data and individual circumstances: 0.15 percent. The question before Commerce was therefore what bearing that information should have on its calculations.

   Contrary to ATM's suggestion, the PRC-wide entity's rate assigned to ATM could not be ATM's prior separate rate of 0.15 percent. That rate was an individual margin that reflected ATM's individual circumstances and individual pricing behaviors. Once Commerce determined that ATM was ineligible for such an individual margin, Commerce grouped ATM together with the other state controlled companies -- as a result, the rate ATM would receive had to reflect the aggregate behavior of the entire PRC-wide entity, not just ATM's own behavior. *See generally* Remand at 7-8 (explaining that ATM had to be subject to the single PRC-wide rate). Because, during its investigation, Commerce had found the PRC-wide rate to be 164.09 percent, it stands to reason that the rate ATM receives as part of the PRC-wide entity should reflect a portion of that number.

   But DSMC is similarly [incorrect] to claim that the 0.15 rate should have no bearing at all on Commerce's calculations. *See generally* DSMC Br. at 6-9. By incorporating ATM into the PRC-wide entity, Commerce changed the group of companies that comprised that entity. Moreover, with ATM included among the group of state-controlled companies, Commerce knew (based upon information in the administrative record) that at least some portion of the PRC-wide entity was dumping at 0.15 percent. Commerce reasonably determined that it should recalculate the PRC-wide rate to account for this new information.

   Commerce's ultimate conclusion -- finding that the PRC-wide margin should be halfway between the rate previously calculated for ATM and that previously calculated for all of the other state-controlled companies -- reflects a reasonable resolution of these considerations. On one hand, Commerce acknowledged that the information ATM provided about its pricing behavior was relevant to the PRC-wide entity because ATM was now a part of that entity; on the other hand, Commerce recognized that there were more components to the PRC-wide entity than just ATM.

   And the decision to take a simple average between the known rate for ATM and the prior rate for all the state-controlled companies is reasonable given that Commerce had no information about what proportion of the PRC-wide entity ATM comprised -- and therefore could not calculate a more precise weighted average.[4]

---

[4] *Cf.* 19 U.S.C. § 1673d(c)(1) ("[i]f the determination of the administering authority under subsection (a) of this section is affirmative, then . . . (B)(i) the administering authority shall -- (I) determine the estimated weighted average dumping margin for each exporter and producer individually investigated, and (II) determine . . . the estimated all-others rate for all exporters and producers not individually investigated") *with* 19 C.F.R. §351.107(d) ("in an antidumping proceeding involving imports from a nonmarket economy country, 'rates' may consist of a single dumping margin applicable to all exporters and producers").

Indeed, Commerce did not have information to determine with any greater precision what portion of the PRC-wide entity ATM represented.

ATM and DSMC present various theories to challenge Commerce's determination. None of these have merit. For example, ATM claims that averaging its calculated individual rate with that of the PRC-wide entity improperly punished it with an "adverse" rate. But a similar line of argument has already been laid to rest by this Court's decision in *Advanced Tech*, which has been upheld by the Federal Circuit. *See* 938 F. Supp. 2d at 1350-51. There, this Court considered the application of the PRC-wide rate to ATM in the context of the diamond sawblades investigation, and concluded that applying the PRC-wide rate to ATM was not, in itself, an application of adverse inferences. *See id.* Rather, it was merely the consequence of ATM failing to rebut the presumption of state control. *See id.*

Further, as the Court noted, the fact that the PRC-wide rate was itself calculated based on adverse inferences did not make applying that rate to ATM improper. *See id.* As the Court explained, the PRC-wide entity rate must be corroborated to the PRC-wide entity as a whole, and not to the individual members of that entity. *See id.*; *see also Peer Bearing Co.--Changshan v. United States*, 587 F. Supp. 2d 1319, 1327 (2008) ("[T]here is no requirement that the PRC-wide entity rate based on AFA relate specifically to the individual company. It is not directly analogous to the process used in a market economy, where there is no countrywide rate. Here, the rate must be corroborated according to its reliability and relevance to the countrywide entity as a whole.") (citations omitted). This reasoning defeats all of ATM's claims that the rate it received was not properly corroborated, or that the rate was improperly based on certain companies' failure to cooperate in the investigation when there was no equivalent failure in this review. Simply put, once Commerce established the PRC-wide rate, it was permitted to use that rate in the manner it did in this review.

ATM's complaint that the PRC-wide rate could not be used because it was not part of the record of this review is similarly misguided. The PRC-wide rate from the investigation was public information that was known to Commerce and all interested parties. ATM presented no new evidence to suggest that the country-wide rate was no longer applicable to the PRC-wide entity. Accordingly, the use of that rate was proper.

For its part, DSMC claims that Commerce's decision to recalculate the PRC-wide rate after including ATM in the PRC-wide entity was inconsistent with various precedent finding that an individual company's behavior ceases to be

meaningful once it is included in a country-wide entity.[5] This argument also misses the point. Commerce was not conducting a *de novo* inquiry into ATM's behavior; rather, as a result of its decision to include ATM in the PRC-wide entity, Commerce had new record information about the PRC-wide entity as a whole. It is not improper for Commerce to consider such new information: DSMC certainly cites no law or regulation that precludes Commerce from doing so. *See generally* DSMC Br. at 7-9. And although DSMC is correct that cases from this Court have stated that a company's individual behavior becomes irrelevant once that company is incorporated into the country-wide entity, those cases dealt with whether Commerce was required to inquire into an individual company's individual pricing behavior in the first instance before assigning it a country-wide rate. *See*, *e.g.*, *Jiangsu*, 884 F. Supp. 2d at 1312 n.21; *Advanced Tech*, 938 F. Supp. 2d at 1350 51. The language of those cases therefore does not -- and should not -- preclude Commerce from considering what it actually knows about portions of the country-wide entity in assigning that entity a rate. Indeed, it would be strange if Commerce were required to blind itself to information about the circumstances of a portion of the country-wide entity to which Commerce assigns an estimated margin.

DSMC also complains that Commerce should have recalculated the PRC-wide rate not as a simple average of ATM's prior rate and the rate of the other state-controlled companies, but as a weighted average: in DSMC's view, because there were at least 21 other state-controlled companies, ATM's pricing behavior should have accounted for only 1/22 of the total. *See* DSMC Br. at 9-10. But there is no reason to think that the latter approach is any better than the one Commerce used. The record contained no information about what portion of the PRC-wide entity ATM comprised. Assuming that each known company that made up the entity produced and exported the same volume of goods is no more justified than assuming

---

[5] *See* DSMC's Cmts on RR (May 13, 2015) at 7-8; *see also* DMSC's Resp. to Def-Int's Cmts at 4-6, referencing, *inter alia*, *Brake Rotors from the PRC*, 70 Fed. Reg. 24382, 24389 (May 9, 2005) (*inter alia*, prelim. seventh rev. results; denying respondent a separate rate based on information obtained at verification and not altering the PRC-wide rate based on that respondent's margin calculation), unchanged in final determination, 70 Fed. Reg. 69937 (Nov. 18, 2005) (*inter alia*, final seventh rev. results); *Porcelain-on-Steel Cooking Ware from the PRC*, 70 Fed. Reg. 76027 (Dec. 22, 2005) (prelim. rev. results denying separate rate and not altering PRC-wide rate based on respondent's margin calculation), unchanged in final determination, 71 Fed. Reg. 24641 (Apr. 26, 2006) (final rev. results); *and see also* DSMC's Cmts on RR at 6-8 acknowledging recent *contra*, *e.g.*, *Certain New Pneumatic Off-the-Road Tires From the PRC*, 80 Fed. Reg. 20197 (Apr. 15, 2015) (final rev. results; 2012-2013) and accompanying issues and decision memorandum at cmt. 1 (finding respondent ineligible for separate rate and calculating final margin for PRC-wide entity, including respondent, using a simple average of previously assigned PRC-wide rate and the calculated final margin for respondent).

>           that ATM comprised one half of that total.  But, unlike DSMC's methodology, Commerce's approach is consistent with its practice of performing a simple average where a weighted-average is not available.
>
>           Finally, DSMC's claim that Commerce did not adequately explain its reasoning on these points is likewise unavailing. In its remand, Commerce explained its decision to recalculate the PRC-wide rate and cited authority for doing so. *See generally* Remand at 2-4, 7-10. If Commerce's explanation does not refute every argument DSMC now presents, that is because Commerce did not previously see those arguments: Commerce only made the decision to re-calculate the PRC-wide rate after the draft remand results. Nevertheless, Commerce's remand provides a reasoned explanation for its decision.
>
>           In the end, Commerce's determination on remand was a proper resolution of the issue facing Commerce. Accordingly, it should be sustained.

Def's Resp. to Remand Cmts at 4-9 (footnotes omitted; court's bracketing in part).

*Discussion*

The question on remand for Commerce was the ATM entity's eligibility for a separate rate, consistent with *Advanced Tech*. As mentioned, in redetermining the ATM entity to have been part of the PRC-wide entity, Commerce concluded that it had to reconsider what impact that had on the PRC-wide rate.

Commerce's address of the ATM entity's comments, above, is not unreasonable. Commerce has a well-established practice of assigning the PRC-wide entity rate to individually investigated respondents who participated in an investigation or review but do not qualify for a separate rate. *See*, *e.g.*, *Certain Pneumatic Off-the-Road Tires from the PRC*, 80 Fed. Reg. 20197 (Apr. 15, 2015) (final 2012-2013 rev. results) and accompanying issues and decision memorandum at cmt. 1; *Certain Activated Carbon From the PRC*, 78 Fed. Reg. 26748 (May 8, 2013) (prelim. 2011-2012 rev. results) and PDM at 10-11, unchanged in final results, 78 Fed. Reg. 70533 (Nov. 26,

2013).  Research indicates that prior to December 4, 2013, whenever a respondent failed to establish its eligibility for a separate rate Commerce's practice was to conditionally "review" the PRC-wide entity rate.[6]  *See*, *e.g.*, *Certain Lined Paper Products From the PRC*, 78 Fed. Reg. 34640 (June 10, 2013) (*inter alia* prelim. 2011-2012 rev. results) and accompanying issues and decision memorandum.  Given such practice and the circumstances of this case, ATM's arguments regarding a lack of corroboration of the PRC-wide rate and the inapplicability of that rate (as "reviewed") to it are inapposite; further, the DSMC's contention that Commerce omitted explanation of why it considered that the PRC-entity rate had to be reexamined is also without merit.

        Commerce's overall response to the DSMC's comments is also reasonable, although further clarification would have been helpful.[7]  For example, in response to the DSMC's case references, Commerce distinguishes its reconsideration of the ATM entity's eligibility for a separate rate as "not conducting a *de novo* inquiry into ATM's behavior" on remand.  The court is unsure of what Commerce means by this, as that characterization does not accurately encompass what transpired during the proceeding.  Commerce has oft-stated that it considers each segment of an antidumping proceeding as separate (essentially a blank slate), *see*, *e.g.*, *Shandong Huarong Machinery Co. v. United States*, 29 CIT 484, 491 (2005), and thus whether the ATM entity was

---

[6] *See Antidumping Proceedings: Announcement of Change in Department Practice for Respondent Selection in Antidumping Duty Proceedings and Conditional Review of the Nonmarket Economy Entity in NME Antidumping Duty Proceedings*, 78 Fed Reg. 65963, 65970 (Nov. 4, 2013) (current administrative practice now requires an explicit request prior to initiating a review of the NME entity).

[7] *See Bowman Transportation, Inc. v. Arkansas-Best Freight System Inc.*, 419 U.S. 281, 285-86 (1974) (a court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" ).

eligible for a separate rate (a *de novo* question) was part and parcel of this first administrative review proceeding.  In other words, the fact that it was judicial process that has led to reconsideration of the question would seem to be irrelevant.

The DSMC also argued the matter at bar resembles the type of situation Commerce confronted during litigation of the original investigation, in which Commerce did not alter the PRC-wide entity rate but rather in the final analysis assigned the existing PRC-wide rate to the ATM entity without regard for the originally-calculated individual margin.  *See Advanced Tech*, 938 F. Supp. 2d at 1342.  The DSMC's proposition is valid, but only to a certain extent, because the rate established at the investigation is only intended to be an estimate, whereas it is at the administrative review stage that the actual and "precise" assessment and future cash deposit rate is established.  *See, e.g.*, *AK Steel Corp. v. United States*, 21 CIT 1204, 1215 (1997).  On the other hand, as the DSMC imply, there is no reason to suppose that consideration of the impact the ATM entity's inclusion in the PRC-wide entity, as confirmed through litigation, was precluded during the LTFV investigation.

Commerce's response to the DSMC's arguments also elides over what transpired in *Brake Rotors from the PRC*, in which the respondent in question, Huanri General, was first examined in the fifth new shipper review of that subject merchandise and granted a separate rate.  *Brake Rotors From the PRC*, 66 Fed. Reg. 29080 (May 29, 2001) (prelim. results and partial rescission of new shipper rev.).  During the seventh administrative review of the merchandise, Huanri General, apparently cooperative, was denied a separate rate based on information obtained at verification.  70 Fed. Reg. at 24389.  And it is notable that such circumstance did not cause Commerce to consider altering the PRC-wide rate based on Huanri General's margin calculation.  *Cf.* 70 Fed. Reg. at 24392

(unchanged in final results, 70 Fed. Reg. 69937) *with Brake Rotors From the PRC*, 69 Fed. Reg. 42039, 42040 (*inter alia* final sixth rev. results). Commerce's expressed position here -- that it is not precluded from considering what it actually knows about portions of the country-wide entity when reexamining the country-wide margin -- may be legally correct, but the DSMC are also correct that Commerce's position is at odds with *Brake Rotors from the PRC*. Nonetheless, the court cannot conclude Commerce's position unreasonable, as it would indeed be "strange" were Commerce so precluded as a matter of law.

The DSMC also argue *Porcelain-on-Steel Cooking Ware from the PRC*, *supra*, is analogous. That administrative review, however, does not support the proposition that the conduct of individual members of the PRC-wide entity is meaningless to the determination of the appropriate rate for that PRC-wide entity -- in fact, quite the opposite. The only respondent in that proceeding, Watex, had been determined ineligible for a separate rate. 70 Fed. Reg. at 76028-29. "As a result," Commerce determined "that it is necessary to review the single PRC entity, including Watex, in this segment of the proceeding." *Id*. at 76029. The "reviewed" PRC-entity received an adverse inference and adverse facts available because Watex had failed to comply to the best of its ability with repeated requests for information, and Commerce therefore assigned the PRC-entity "the highest rate determined in any previous segment of this proceeding." *Id*.[8]

---

[8] *Cf. Antidumping Manual*, Ch. 10 §IV.B. ("Occasionally, the NME-wide rate may be changed through an administrative review.[ ] This happens when 1) the Department is reviewing the NME entity because the Department is reviewing an exporter that is part of the NME entity, and 2) one of the calculated margins for a respondent is higher than the current NME-wide rate") (noting that in a new shipper review, there is no change to the NME-wide rate, as a new shipper review covers only an exporter that is eligible for a separate rate, and referencing *Freshwater Crawfish Tail Meat from the PRC*, 67 Fed. Reg. 19546, 19549 (Apr. 22, 2002) (*inter alia*, final rev. and new shipper results)).

Court No. 13-00078                                                                                                        Page 14

    The *status quo* of the matter at bar, by contrast, is a record of the PRC-wide entity that was previously determined uncooperative during the investigation but which now includes the cooperative ATM entity as part of the PRC-wide entity. The particular portion of the *Redetermination* addressing that circumstance provides: "unlike the [LTFV] investigation, no part of the PRC-wide entity failed to cooperate to the best of its ability." RR at 9. As mentioned, the ATM entity characterizes this as a determination of "full" cooperation by the PRC-wide entity. Def-Int's Cmts. on RR at 1. That characterization, however, depends on the extent to which the ATM entity's cooperation may reasonably be imputed to the remainder of the PRC entity, and substantial evidence of record does not support imputation to that extent. The record does not reveal "cooperation" of the PRC-wide entity beyond that of the ATM entity; the only other individually examined company in the review at bar, besides the ATM entity, was Weihai Xiangguang Mechanical Industrial Co., Ltd., which was presumed to be part of the PRC-entity until it demonstrated an absence of *de jure* and *de facto* control by the PRC government and entitlement to a separate rate, and because it established that entitlement, its cooperativeness cannot be imputed to the PRC-wide entity. At best, the record can be construed as only a "review" of the PRC-wide rate, within the meaning of 19 U.S.C. §1675(a), but not the PRC-wide entity itself, *i.e.*, as and of the consequence of the ATM entity's ineligibility for a separate rate, since it does not appear that Commerce queried information from the remainder of the PRC-wide entity apart from the ATM entity, to which a response would have been required, and from which "full" cooperation could be inferred. Hence, the court agrees with the DSMC that more is required from the record than, for example, the various (but not all) parties' submissions of requests for administrative review and the

various voluntary submissions of comments in order to support the implication of "full" cooperation in the context of a review of a country-wide rate that is based in part on information from the investigation and in part on information obtained during review of an entity that had originally been deemed eligible for a separate rate until that determination was reversed in consequence of appeal.

In short, whatever else its expressed policy or practice may indicate on the general subject, to the extent Commerce reexamined ("reviewed") the PRC-wide rate, it was only, as Commerce explains, for the purpose of incorporating a "cooperative" part of the PRC-wide entity as a consequence of *Advanced Tech*, nothing more. However, the DSMC also argue that the implication in the *Redetermination* of a "cooperative" PRC-wide entity including the ATM entity was expressed without a determination on whether CISRI should also be collapsed as a part of the ATM entity. Considering the point, the court notes that CISRI was listed in the notice of initiation of this review, but it does not appear, from the administrative list of record documents, that CISRI requested either administrative review or "separate rate" consideration, unlike other PRC companies listed in the notice of initiation. *Cf. Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 75 Fed. Reg. 81565 (Dec. 28, 2010) *with*, *e.g.*, PDocs 1-15. In light of the fact that the ATM entity's ineligibility for a separate rate caused Commerce to re-examine the PRC-wide margin and consider "cooperation" in that re-examination, consideration of CISRI's "cooperation" (as a part of whichever entity, ATM or PRC) was not irrelevant, but the DSMC do not elaborate upon the evidence of record that would support determining non-cooperation, or upon what impact that would have on Commerce's "review" of the PRC-wide rate within the meaning of 19 U.S.C. §1675(a), given that at the time in question it was

Commerce's apparent policy to undertake such a re-examination once it determined that an entity requesting a separate rate (the ATM entity in this instance) was ineligible for that status.[9]

In the final analysis of the record at bar, the court is not persuaded that Commerce's final results of redetermination and the revised PRC-wide rate, based on a simple average of the PRC-wide rate from the investigation and the information Commerce had with respect to the ATM entity, were unreasonable, unsupported by substantial evidence, or otherwise not in accordance with law. *Cf. Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (noting that 19 U.S.C. §1673d(c)(5)(B) and the Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103 316 (1994), both "explicitly allow Commerce to factor both *de minimis* and AFA rates into its calculation methodology" and there is "no legal error in Commerce's use of a simple average rather than a weighted average"). The court can agree that adjustment of a country-wide rate based on a weighted average, for example the number of entities comprising the PRC-wide entity or U.S. market share, would better account for cooperative respondents determined ineligible for a separate rate, however judicial review does not involve displacement of the agency's reasonable resolution of "fairly conflicting views" on this record. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

---

[9] The DSMC's wider argument -- that Commerce's administrative review practice has not ordinarily resulted in decreased PRC-wide rates --expresses a valid point, as there may be sound reasons for treading with caution when it comes to considering a downward adjustment of the PRC-wide rate, not least of which is to avoid, as they argue, conferring upon previously or potentially "uncooperative" elements of the PRC-wide entity (as indicated by the *status quo* of a particular proceeding including the investigation phase) the benefit of categorically distinct "cooperative" elements during a particular segment that "do not meet," in the final analysis, the criteria for a separate rate, and avoiding the potential for manipulation of the NME-margin. Whether such concerns can theoretically be mitigated by random respondent selection does not appear to be the matter before the court, at any rate, and no opinion, therefore, need here be expressed thereon.

*Conclusion*

In view of the foregoing, Commerce's results of redetermination will be sustained and judgment entered accordingly.

                                                /s/ R. Kenton Musgrave
                                               R. Kenton Musgrave, Senior Judge

Dated: September 23, 2015
       New York, New York